Hunt v. Johnston.

———◦•◦◦•———

HUNT, Respondent, v. JOHNSTON, Appellant.

1. Mere proposals preliminary to a contract form no part thereof unless incorporated into it.

*Appeal from Jefferson Circuit Court.*

*Frissell*, for appellant.
*Noell*, for respondent.

RYLAND, Judge, delivered the opinion of the court.

This was a suit brought to recover from Johnston twelve hundred and fifty dollars for so much money had and received by him for the plaintiff. The plaintiff charges that the defendant and himself, being the owners as tenants in common of a certain amount of real estate, agreed between themselves that the said Johnston should sell one-half thereof for a sum not less than ten thousand dollars, and to receive as his compensation any excess he might be able to get over that amount, and was to retain one-fourth interest himself and to secure to the plaintiff one-fourth interest in the land. The plaintiff charges that Johnston did proceed to sell and did sell more than one-half interest in the lands, viz., twenty-one thirty-fifth parts

33—VOL. XXIV.

thereof, for the sum of twenty-one thousand dollars. Plaintiff charges that defendant sold of the plaintiff's interest ten thirty-fifths, and out of his own share eleven thirty-fifths; that plaintiff and defendant executed a deed to carry out this arrangement, from which it will be seen that there is reserved to plaintiff one and one-fourth thirty-fifth parts less than the interest that was to be reserved to him according to said agreement; and for this excess over the one-fourth sold, thereby leaving less than one-fourth remaining to plaintiff, the said Johnston received the sum of twelve hundred and fifty dollars, and refuses to pay the same to the plaintiff, and therefore he asks judgment for the same and interest thereon.

The defendant answered, denying the plaintiff's right to recover. He denies that there was any agreement between plaintiff and himself that he (defendant) should sell one-half of the land in the deed in the petition mentioned for a sum not less than ten thousand dollars. He denies that there was any agreement between them that he should retain one-fourth interest for himself and secure one-fourth interest to the plaintiff. He states that he and plaintiff were tenants in common and owners of nineteen hundred and twenty-one acres of mineral land, entered by them between the 26th day of December, 1853, and the 18th of January, 1854, both days included. He sets out the numbers of the land entered by the township, range and parts of sections. He states that about the date of the last entry of said lands, wishing to dispose of part of the same, he wrote to plaintiff asking if he would be satisfied for this defendant to sell one-half of their lands, consisting of upwards of nineteen hundred acres, for ten thousand dollars, five thousand of which was to be paid to plaintiff, and defendant retaining five thousand dollars, and whatever he might get over ten thousand, for his trouble in selling. About the same time, he requested the plaintiff to select some of the best of said lands and not include them in the contemplated sale. In reply, plaintiff urged the defendant to sell all the lands, reserving only a small fractional piece of about sixteen acres. He also men-

tioned an eighty acres more which he thought had better be re-
served : he mentioned also a forty acre tract which was not
included in their entries. He also expressed his willingness to
take five thousand dollars for one-half of his interest in all of the
land which they had entered as above mentioned, and urged the
sale of the whole. The defendant admitted that by selecting
eleven hundred and twenty acres of said land, and that not of
the best quality, and by dividing it into thirty-five shares, he ef-
fected a conditional sale of twenty-one of said shares nominally
at one thousand dollars a share. He alleged that the sale of
these twenty-one shares was dependent upon the proper convey-
ance being made of said eleven hundred and twenty acres by
the plaintiff and defendant to certain persons in Pittsburgh, in
whom the legal title was to be vested for the benefit of the dif-
ferent shareholders ; that after making the conditional sale and
before receiving any portion of the money he returned to Mis-
souri, and after informing the plaintiff fully of all he had done—
that conditional sales had been made of twenty-one out of
thirty-five shares into which the eleven hundred and twenty
acres had been divided, nominally at one thousand dollars per
share ; that no part of the money became due till after the deed
should be made, and that no part of it had been paid—and in
consideration of two thousand dollars then paid by defendant
to plaintiff, the plaintiff made an agreement dated 15th March,
1854, with the defendant, by which it was stipulated that the
plaintiff should be paid three thousand dollars more ; that seven
and a half shares, out of the thirty-five into which the eleven
hundred and twenty acres had been divided, should be delivered
up to him upon the execution of the deed for his interest in the
eleven hundred and twenty acres of land to the trustees in Pitts-
burgh as aforesaid ; that plaintiff afterwards received the sum
of three thousand dollars and the seven and a half shares, and
executed the deed ; that upon the payment of the three thou-
sand dollars and receipt of the shares the whole business was
fully settled between plaintiff and defendant, and all demands
against defendant in favor of plaintiff fully paid.

There was a trial and judgment for the plaintiff for the sum of fourteen hundred and five dollars and ten cents. The defendant moved for a new trial, which being overruled he brings the case here by appeal.

From the bill of exceptions we find that the deed by Hunt, the plaintiff, and his wife, and Johnston and his wife, to the trustees Kidmer and Robur, for the eleven hundred and twenty acres of land in trust for the shareholders, bears date 31st March, 1854. In this deed seven and a half parts or interests are reserved for Hunt. The testimony shows that the propositions about the sale of a part of the land were made in some letters from Johnston to Hunt. It becomes material to notice these propositions and the answer of Hunt. In Johnston's letter to Hunt, dated 17th January, 1854, at St. Louis, he says : "Will you be satisfied to give me for my trouble, &c., in making the sale—that is, provided I can do it—all I can get over ten thousand dollars in cash or good paper, for *one-half* of all the mineral land we have entered at the ' Old Mines,' having no reference to the Casey lands, and you and I still to own one-quarter each, and the ten thousand dollars to be divided between us—five thousand, each—say about twelve hundred acres of land ? In case you are willing that I may have all I can get over the ten thousand, say so by return mail, and I will try my best. If you wish to do it, I think you had best get Sarah Hunt to write it ; you sign it, and Mr. O'Mara can direct it. Have the letter directed to No. 41 south Fourth street, and it must come next mail." In his letter dated 18th January, 1854, at St. Louis, to Hunt, he says: " If you consent to my selling in the way I proposed—one-half of say twelve to fifteen hundred acres—I want you to select those that you would prefer to keep for ourselves, recollecting, however, that you and I will only sell one-quarter each of the twelve or fifteen hundred acres which I propose selling for ten thousand dollars. I to have any thing which I may obtain over that for my trouble, &c., and you to have five thousand dollars and I five thousand dollars of the said ten thousand. State in your letters to me the numbers, &c.—all in

township 38—which you would rather keep for ourselves, and, as I have all the numbers, I will select those you do not want, if I should succeed in making a sale." In a letter dated 30th January, 1854, at Philadelphia, to Hunt, Johnston says: "Your favor of the 22d inst. came to hand this morning; I shall wait patiently for the map, &c., of Mr. O'Mara, and will proceed with my effort to dispose of the *half* (*or otherwise*, as I can) of 1500 or about that number of acres of mineral land. I wrote to you from Chicago stating that some objection presented itself to me in presenting only half of land to parties; that I thought I would be compelled to divide the whole fifteen hundred acres—about that—into so many parts, and you and I retain each our parts equal with the other parties. This letter you have doubtless since received, and I ask you to authorize me to do whatever I thought proper, so that you and I hold interests in it according to the parties interested. I therefore advise that you would authorize me, in a general way, to dispose of the fifteen hundred acres in whatever way or manner I may think proper, and that I shall be entitled to all I can obtain over the five thousand dollars; which, with one part and one interest *undivided*, must be secured to you." I do not consider it material to notice the testimony of the witness Talbott; what he related obviously came to his knowledge from the correspondence between Johnston and Hunt.

The defendant offered in evidence the abstract from the Land Office showing the lands entered; also a letter to him from plaintiff, in which he says: "In one of your letters, you propose to make sale of one-half of all those mineral lands which we have entered, and ask me if I will be satisfied to give you, for your trouble in making sale, all you can get over ten thousand dollars in cash. In reply, I have to say that I will be satisfied to sell one-half of our mineral lands, reserving the fraction of 16 28-100 acres, for ten thousand dollars, although I am confident from their location and from trials already made that one-half is worth more than ten thousand dollars, and I shall be satisfied that you shall have all you can get over

the ten thousand dollars for your trouble. My advice is not to reserve any but the 16 28-100 acre fraction; by these means we can show any person who may come and examine the lands several good prospects, and as I am determined to open one or two of them immmediately. In the first place, I have reserved several pieces, which Mr. O'Mara has drawn off, and which are herewith inclosed, and you can use your own pleasure in this regard; as for my part, I would rather let the whole go together in this way. Those who may purchase will do well.'' The defendant then read in evidence the deed made by himself and Hunt and their wives to Kidmer and Robur, the trustees for the stockholders, of the thirty-five shares. Then, having first proved the handwriting of Hunt, he read in evidence a receipt and agreement, signed by Hunt, dated 15th March, 1854, as follows : '' St. Louis, Mo., March 15th, 1854. Received of Robert Johnston, the sum of two thousand dollars, in consideration of which I do hereby agree for myself, my heirs and assigns, to convey to Kidmer and Robur, of Pittsburgh, Pa., as trustees, all my interest in eleven hundred and forty acres of mineral land, situate in Washington county, Mo., described as follows : '' In section 3, township 38 north, range 2 east, 160 acres ; in section 9, same township, &c., 300 acres ; in section 10, same township, &c., 320 acres ; in section 15, same township, &c., 200 acres ; in section 20, same township, &c., 80 acres ; in section 21, same township, &c., 80 acres—making in all 1140 acres ; it being understood and agreed that on the execution of the said deed of conveyance in fee simple as aforesaid, the further sum of three thousand dollars shall be paid to me by the said Robert Johnston ; and further, that certificates for seven and one-half parts of the thirty-five parts which compose the whole number of parts into which mineral land is divided shall be issued in my name, as my own property. The above is correct, with the erasure. [Signed] James Hunt.'' He then read an account stated and balanced between Hunt and Johnston, dated March 31st, 1854, and signed by Hunt. This purports to be on a settlement of all private matters remaining

this day unsettled between Gen. James Hunt and Robert Johnston, intending hereby to settle up every thing.   The account embraces moneys paid out by Hunt for and on account of the joint business of himself and Johnston, the last item being the three thousand dollars on account of the conveyance of the eleven hundred and twenty acres of land to Kidmer & Robur, the trustees, &c., the balance of the five thousand dollars.   Then follow the various items in which Hunt is debtor to Johnston, concluding with a draft on Kidmer and Robur for $1880 81, making the account balance.   Signed "This settlement is satisfactory to each of us.   Witness our hands, this date above written.   [Signed] James Hunt, Robert Johnston."

I have given a very full statement of the facts of the case, in order to a proper understanding of the law arising on the instructions given by the court, as well as those asked for and refused by the court.   The court, of its own motion, then gave the following instructions : " 1.  The court instructs the jury as follows : That by the proposals contained in the letters of Johnston to Hunt, of the 17th and 18th January, 1854, Hunt would have become entitled, upon a sale made by Johnston, to $5000 in money and eight and three-fourth shares out of the remaining shares sold ; and if the jury find that the sales were made by Johnston according to these proposals assented to by Hunt, then Hunt's rights as above immediately attached and became vested in him accordingly, and he can not be divested of them or barred from asserting by any subsequent contract not made upon sufficient consideration.   2.  If the jury find that the sales were made by Johnston under an agreement as proposed by him, then Hunt, not having received his full number of shares, according to its terms, is entitled to recover of the defendant one and a quarter shares, or their value, if sold, to be estimated by the amount actually received on sale on them.   3.  If the jury find that Hunt became entitled to the $5000 and 8¾ shares out of 35 of the remainder of shares unsold, as above, and that in consequence of the sale by Johnston under his proposals as above, Hunt had a complete and vested

right to them before the agreement of the 15th March, 1854, was made, then the written agreement as to the one and a quarter shares, if in the absence of any evidence of a consideration to support it, is not binding on Hunt, and is no bar to his right of recovery. 4. If the jury find that before signing the paper writing of the 15th March, 1854, Johnston had sold the shares according to an agreement as evidenced by the proposals contained in his letters, and that by fraud and circumvention Johnston deluded Hunt into signing that instrument, then the jury will also disregard that instrument, and any settlement made according to it, as any evidence of right in the defendant or as any bar to the recovery of the plaintiff. But if the jury find that no agreement as evidenced by the proposals contained in these letters was ever assented to by Hunt, or if made and before Johnston had made any sales under and before any right attached, Hunt and Johnston entered into a new agreement as evidenced by the paper writing of the 15th March, 1854, then the rights of the parties must be settled and determined according to the terms of that instrument; and if the jury so find, then the settlement of the 30th March, 1854, is conclusive against the plaintiff's claim, and the jury will consequently find a verdict for the defendant. 5. If the jury find that Hunt authorized Johnston to sell only one-half of his interest in the land, or eight and three-fourths shares out of thirty-five, then the sales made by Johnston, on Hunt's account, will be presumed to be limited to the extent of that half, and all beyond be considered as made on his own account, to be drawn out of his individual and separate shares; and if the jury so find, the defendant will be entitled to their verdict. 6. Yet the jury are at liberty to consider how far the execution of the deed from Hunt and Johnston to the trustees, in which only seven and a half shares are reserved to Hunt, is evidence of an authority from him to sell more than one-fourth on his account, or how far it is evidence of a sale by Johnston of one and a quarter shares on Hunt's account, and a ratification by Hunt of such sale, or how far Johnston's reserving to himself six and a half

of the remaining shares is evidence to disprove that the sale of one and a quarter shares to have been made on his own account; and if, from the whole evidence, the jury shall believe that the one and a quarter shares sold by Johnston was sold and taken out of Hunt's shares, then Hunt is entitled to the proceeds, and the jury will find a verdict for the plaintiff." To the giving of these the defendant excepted.

The following instructions the defendant asked the court to give, which were refused: "1. That the letters of Robert Johnston to James Hunt were merely preliminary to the contract which was finally made, and are not to invalidate the contract subsequently executed. 2. That if they find from the evidence that Hunt has received the number of shares in the 1120 acres of land that by the agreement executed by him he was to receive, and also the amount of money he was to receive by the agreement, they will find a verdict for the defendant. 3. If the jury shall find from the evidence that James Hunt received from Robert Johnston five thousand dollars, and seven and one-half shares out of the thirty-five into which the said eleven hundred and twenty acres of land was divided, in full satisfaction of his half of said eleven hundred and twenty acres, they will find for the defendant."

These instructions given did not fairly put the question before the jury. The court should have informed the jury that the letters from Johnston to Hunt are but proposals for permission to sell, and were offers for a compensation for selling. Now Hunt did not limit Johnston to the 1120 or 1140 acres. Johnston's letters mention as high as from twelve to fifteen hundred acres, and Hunt was perfectly willing for Johnston to sell that amount or sell all except the 16 28-100 acres. There was no settled understanding about the quantity which Johnston wanted permission to sell. He says in one of his letters: "I will proceed with my effort to dispose of the half (or otherwise, as I can) of 1500 or about that acres of mineral land." Hunt gave Johnston authority to do as he pleased. He would rather sell them all: "I would rather let the whole go toge-

ther in this way." Here were two men deeply interested in land speculating. One had gone east, and he desired permission from the other to sell half or more than half. They had entered about nineteen hundred acres. Johnston thought he could sell half or about twelve to fifteen hundred acres—no particular quantity. He was willing to do his best to sell, and he was willing to trust for his services to whatever excess over ten thousand dollars he might receive in money or good paper. This was considered by these gentlemen as a profitable speculation. They had entered with warrants and money at a price not to exceed $1 25 per acre, and I suppose the warrants not more than one dollar per acre ; then, in less than four months, a sale at eight to ten dollars per acre was very gratifying to these mineral land speculators. But Johnston finally lays off 1120 acres, in thirty-five shares, and sells twenty-one of these shares for nominally one thousand dollars a share. But this sale is dependent on the consent of Mr. Hunt. He must with his wife make a deed in fee simple for the land, uniting with Johnston and his wife, to trustees, for the benefit of so many persons as had bought shares named in the deed, and also for the benefit of Johnston and Hunt—each one having a part of the shares. Hunt had seven and a half shares. This deed mentions the consideration of thirty-five thousand dollars—a thousand dollars a share. Mr. Hunt knew how many shares had been sold. He receives his two thousand dollars—agrees to convey his title—afterwards makes the deed and receives the balance of the five thousand dollars, and expressly makes a full settlement and acknowledges the same to be satisfactory. The jury should have been told that if they believed from the evidence that Hunt and Johnston settled their land business after Johnston's return, and that Hunt received his five thousand dollars for his part of the land sold as joint stock, and received his seven and a half shares, and that it was the understanding and agreement between Hunt and Johnston that the sum of five thousand dollars and the seven and a half shares in the joint stock property of 1120 acres were the consideration of the deed

Hunt v. Johnston.

of Hunt and wife to Kidmer and Robur, and that afterwards a full settlement of this whole business was made between these parties, then the plaintiff had no right to recover.

The receipt and agreement of the 15th March and the making of the deed and settlement must do away with any proposition or proposals in the letters. Hunt has no right to complain because Johnston made more than Hunt, for he knew before he made the deed how much land had been sold. He knew when he made the settlement what the shares had been sold at: He settles and says he is satisfied—content with the seven and and a quarter shares and five thousand dollars; but when he sees how much more his fellow-speculator has made, then he becomes dissatisfied and he must sue. The instruction in regard to fraud and circumvention by which Johnston may have deluded Hunt into signing the instrument of 15th March, 1854, has no foundation for it to stand upon, and should not have been given. So far as these gentlemen are themselves concerned in regard to each other there was no evidence of fraud or circumvention. The substance of the defendant's instructions ought to have been given, especially the two last. The letters were but proposals; there is no specific quantity mentioned and settled upon to be sold by these letters, and when Hunt afterwards ascertains, before he signed the deed, the amount sold into shares as joint stock, and the price and the quantity reserved to him, then was the time to make objection, or to deny the power to sell, or to claim more than the seven and a half shares; but he must be considered by his subsequent actions and conduct as sanctioning what was done, and agreeing to its consequences. I have not thought it necessary to be more particular in pointing out the objectionable instructions. I have laid down what we consider the law governing this case. The judgment must be reversed, and the cause remanded, with directions to proceed with the trial in accordance with the views here laid down; Judge Scott concurring, he alone with me on the bench.